**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jose Jesus URIBE–GALINDO,**
**Defendant–Appellant.**

No. 92–2078.

United States Court of Appeals,
Tenth Circuit.

March 30, 1993.

William D. Fry, Asst. Federal Public Defender, Las Cruces, NM, for defendant–appellant.

David N. Williams (Don J. Svet, U.S. Atty., and Judith A. Patton, Asst. U.S. Atty., with him on the briefs), Las Cruces, NM, for plaintiff–appellee.

Before LOGAN and KELLY, Circuit Judges, and BROWN,* District Judge.

WESLEY E. BROWN, District Judge.

This is an appeal of the district court's denial of a motion to suppress evidence. The case arose out of a search of appellant's car by U.S. Customs Agents at the United States–Mexico border. The search turned up over seventy-five pounds of marijuana hidden in a compartment in the gas tank of appellant's car. Appellant argued in the district court that the search was unlawful. He also alleged that customs agents had obtained a confession from him by questioning him after he had invoked the right to speak to an attorney. The district court rejected both of these arguments. The judge found that the search was reasonable and that appellant had not invoked the right to counsel in the course of questioning by the agents. Accordingly, the district court denied the motion to suppress. Appellant then pled guilty but reserved the right to appeal the suppression issues. On appeal, Mr. Uribe contends that the search of the car violated his Fourth Amendment rights and that customs agents denied him the right to have counsel present during questioning.

I. *Standard of Review.*

We must accept the factual findings of the district court unless they are clearly erroneous. *See United States v. Walker,* 933 F.2d 812, 815 (10th Cir.1991). At a hearing on a motion to suppress, the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge. *Id.* Accordingly, we review the evidence in a light favorable to the district court's determination. The ultimate determination of reasonableness under the Fourth Amendment, however, is a determination of law that we review *de novo. Id.* As to appellant's claim concerning the invocation of the right to counsel, the determination of what appellant actually said is a question of fact that we review only for clear error. *See United States v. De La Jara,* 973 F.2d 746, 750 (9th Cir.1992). Whether those words are sufficient to invoke the right to counsel is a legal determination that we review *de novo. Id.*

II. *Facts.*

The facts are largely undisputed. On November 8, 1991, Customs Inspector Clay Evans was working at the United States Customs Station at the Columbus, New Mexico, port of entry from the Republic of Mexico. At 6:56 a.m. on that day he saw a red Chevrolet Blazer enter the customs inspection area from Mexico. Appellant Uribe–Galindo was the sole occupant of the vehicle. Appellant was questioned at the primary inspection area by a customs agent other than Inspector Evans. Evans was watching from the hallway of the customs station. From his vantage point, Evans saw some coconuts in the back of the Blazer. Evans was aware that the U.S. Department of Agriculture prohibited the importation of coconuts unless they were dehusked and drained of milk. The coconuts in the Blazer were not dehusked. After observing the coconuts, Evans directed the primary inspector to send the car over to the secondary inspection area.

At the secondary inspection area, Evans asked appellant to declare what he was bringing into the country. Appellant stated, as he had to the primary inspection officer, that he was bringing in "coconuts and candies." Appellant was asked by the customs agents to remove the coconuts from the car. After he did so, the agents inspected the car. A search was made of the interior of the vehicle. Inspector Sanford also examined the undercarriage of the vehicle by laying down on a mechanic's

* The Honorable Wesley E. Brown, United States Senior District Judge for the District of Kansas, sitting by designation.

"auto creeper" and moving underneath the car. From that vantage point, Sanford noticed that the bolts on the gas tank had been tampered with and that the straps on the tank had been moved. Sanford made this observation approximately three minutes after the time appellant first entered the inspection point. Inspectors Sanford and Evans then reversed positions, and Evans examined the gas tank from underneath the car. Evans noticed wrench marks around the bolts as well as grease on the bolts. He also noticed that the fuel hose had been replaced. Based on his observations, Evans concluded that the gas tank had been removed and recently put back in place. Later, at the suppression hearing, Evans testified that he had seen gas tanks like this on two prior occasions and that both of those tanks had been found to contain marijuana.

After the agents began looking at the gas tank, appellant appeared to become agitated and nervous. The agents escorted appellant into the customs station. The agents then decided to use a fiberoptic scope to look at the interior of the gas tank. When the scope was inserted into the tank, it revealed fresh weld marks, pieces of brazing rod, and what appeared to be a compartment inside the tank. At this point the agents placed appellant in a holding cell inside the customs station. They then moved the vehicle behind the port of entry and removed the gas tank from the car. They noticed a cut on top of the tank. The top of the tank was easily popped off, and a lid on a compartment just underneath was removed. The agents found approximately seventy-five and a half pounds of marijuana in packages contained in the compartment.

Appellant was subsequently interrogated in the customs station. Agent Dan Phillips asked him questions. Because appellant spoke Spanish, Port Director Ron Morales, who was fluent in Spanish, served as an

interpreter. Morales first read appellant his *Miranda* rights. Appellant was asked if he wanted to make a statement. He said yes and signed a form waiving his *Miranda* rights. According to Morales, the only question asked by appellant was whether he could have an attorney later on if he asked for one. According to Morales, appellant wanted to give a statement but was concerned whether, if he wanted to stop answering questions, he could have an attorney present. Morales testified that he told appellant that he had the right to stop the questions at any time and ask for an attorney. Morales testified that appellant wanted to give a statement and that he never asked for an attorney.

III. *Discussion of the Issues on Appeal.*

Appellant concedes that under the Fourth Amendment a "routine customs search" may be undertaken without any suspicion of criminal activity. He contends, however, that the search of his car went beyond the bounds of a "routine customs inspection" and therefore had to be supported by a reasonable suspicion of criminal activity. Appellant contends that the customs inspectors had no reasonable suspicion until after the search was performed.

■ In order to address appellant's argument, we first take note of the scope of the issue before us. Clearly, once the customs agents used the "auto creeper" and found indications that the gas tank had recently been replaced, they had a reasonable suspicion of criminal activity which justified their subsequent examination of the gas tank and the resulting discovery of the marijuana.[1] Thus, the only issue with which we are concerned is whether the agents' initial examination of appellant's car with the "auto creeper" constituted a routine border search.[2] Additionally, we

---

1. Counsel for appellant properly conceded at oral argument that after the Customs agents examined the gas tank from the auto creeper they had a reasonable suspicion of criminal activity. Accordingly, we need not determine whether the use of the fiberoptic scope to examine the interior of the tank was part of a routine border search because that aspect of the search was supported by a reasonable suspicion.

2. For purposes of this opinion, we assume (without holding) that the agents' examination of the undercarriage of the vehicle constituted a

note that appellant's challenge to the search is based solely on the Constitution; no argument is made concerning the governing statutory provisions.

The Fourth Amendment to the Constitution requires that searches and seizures be reasonable. In *United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977), the Supreme Court reviewed its prior treatment of border searches under the Constitution and reaffirmed the principle that border searches, "from before the adoption of the Fourth Amendment, have been considered to be 'reasonable' by the single fact that the person or item in question had entered into our country from outside." *Id.* at 619, 97 S.Ct. at 1980. In *United States v. Montoya de Hernandez,* 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985), the Court again confirmed that "the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior. Routine searches of the person and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant...." *Id.* at 538, 105 S.Ct. at 3309. The Court noted that the United States had strong interests relating to the control of its borders, including an interest in preventing drug smuggling. Against these interests, the Fourth Amendment rights of individuals such as appellant must be balanced. "But not only is the expectation of privacy less at the border than in the interior, but the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is struck much more favorably to the Government at the border." *Id.* at 540, 105 S.Ct. at 3310. For these reasons, "routine border searches" require no reasonable suspicion. *United States v. Ramsey,*

*supra.* When a search or seizure goes beyond the scope of a routine border search, however, reasonable suspicion may be required. *Montoya de Hernandez,* 473 U.S. at 541, 105 S.Ct. at 3310.

The Supreme Court has not defined the precise contours of a "routine" border search. In *Montoya de Hernandez,* the Court indicated that strip searches, body cavity searches, and involuntary X-ray searches would be considered "nonroutine." *Id.* at 541 n. 4, 105 S.Ct. at 3310 n. 4. Several circuits, including this one, have indicated that the distinction between "routine" and "nonroutine" turns to a large extent upon the degree of intrusiveness of the particular type of search. *See United States v. Carreon,* 872 F.2d 1436, 1442 (10th Cir.1989). *See also United States v. Braks,* 842 F.2d 509, 511 (1st Cir.1988).

■ After considering the totality of the circumstances, we have little trouble in finding that the customs agents' examination of appellant's car with the aid of an "auto creeper" was part of a routine border search. To begin with, Inspector Evans testified that an examination of the undercarriage of a vehicle was a "standard procedure" to determine if a vehicle contained any contraband. Tr. at 8. The examination of the undercarriage, if it were a search at all, was perhaps the least intrusive type of search possible. By comparison, in *United States v. Carreon,* 872 F.2d 1436, 1442 (10th Cir.1989) we characterized a search of the *interior* of a vehicle at the border as part of "routine border search procedures." *See also United States v. Sandoval Vargas,* 854 F.2d 1132, 1134 (9th Cir.1988) ("This was merely a vehicle search by customs inspectors, typical of

search. *Cf. United States v. Price,* 869 F.2d 801, 804 (5th Cir.1989) (Visual inspection of the underside of an automobile did not constitute a search.) Neither party raised this as an issue in the case.

Although it was not expressly argued in the briefs, appellant made an issue at oral argument of whether his referral to a secondary inspection station violated the Fourth Amendment because the referral was not supported by any reasonable suspicion. After reviewing the transcript of the suppression hearing, however, it is

clear to us that appellant decided not to raise this as an issue in the district court. *See* Tr. at 27 ("In this particular case, we don't object to the direction into the secondary inspection area....") Appellant has therefore waived any issue regarding the referral to the secondary inspection area. *See* Fed.R.Crim.P. 12(f) (Failure to raise objections which must be made prior to trial shall constitute waiver thereof.) In fairness, we note that the issue may have been first interjected at oral argument by a question from the court.

those conducted at the border."), *cert. denied*, 488 U.S. 912, 109 S.Ct. 270, 102 L.Ed.2d 257 (1988). Clearly, an examination of the exterior of a vehicle is less intrusive than a search of the interior. Any encroachment upon privacy expectations from examining the undercarriage of appellant's car in this case was minimal at best. We conclude that the examination of the undercarriage was part of a routine border search and was reasonable within the meaning of the Fourth Amendment. *United States v. Ramsey, supra.*

Appellant's second contention on appeal is that his Fifth Amendment right to have counsel present during custodial interrogation was violated when customs agents continued to question him after he asked for an attorney.[3] *See Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Although acknowledging that no direct request for an attorney was made, counsel for appellant argues that appellant's response to one of the agent's questions was an equivocal statement that should have been interpreted as a request for an attorney.

■ The only testimony relating to appellant's purported request for an attorney was that of Port Director Ron Morales. After hearing Morales' testimony, the district court concluded:

> The only evidence before the court is that he never asked for an attorney. He merely asked if at some time he wanted an attorney, could he stop answering questions. I don't think that is a sufficient invocation of Miranda rights. He was advised that he could, but he went

ahead and talked and never asked for an attorney.

Tr. at 31.

The *Miranda–Edwards* guarantee is intended to protect the suspect's "desire to deal with the police only through counsel." *Edwards,* 451 U.S. at 484, 101 S.Ct. at 1885. But the likelihood that a suspect would wish counsel to be present is not the test for applicability of *Edwards.* The rule of that case "applies only when the suspect 'ha[s] expressed' his wish for the particular sort of lawyerly assistance that is the subject of *Miranda.*" *McNeil v. Wisconsin,* 501 U.S. ——, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (*citing Edwards.*) To invoke the Fifth Amendment right to have counsel present during questioning requires at a minimum "some statement that can reasonably be construed to be expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." *Id.*

■ The district court's findings concerning the question asked by appellant are not clearly erroneous; they are supported by the testimony of Ron Morales.[4] Appellant was advised that he had a right to an attorney but he told Ron Morales that he wanted to go ahead and make a statement. Appellant asked Morales "if at some time he wanted an attorney, could he stop answering questions." This question cannot be reasonably interpreted as a request for an attorney. It does not contain an expression of a desire for the assistance of an attorney in answering questions. To the contrary, it expressed a present desire to answer questions without an attorney. Appellant wanted to know whether, at some point in the future, he could change his

---

**3.** Appellant does not dispute that his waiver of *Miranda* rights was a voluntary, knowing and intelligent waiver. Rather, he argues that the waiver was invalid under the rule of *Edwards v. Arizona.*

**4.** In so finding, we have considered appellant's arguments concerning the fact that his question was translated into English by an interpreter. Although appellant suggests that the interpreter was less than fully fluent in Spanish, the record viewed in a light favorable to the trial court's findings tells a different story. The interpreter

testified that he was fluent in Spanish and had spoken it since he was a child. At any rate, appellant's allegation raised a factual question for the district judge to consider in determining what appellant said to the Customs Agents. The district judge clearly had no trouble determining what appellant actually said. *Cf. United States v. De La Jara,* 973 F.2d 746, 751 (9th Cir.1992) (The district court's finding as to what a Spanish-speaking defendant actually said in his purported request for a lawyer is reviewed under the clearly erroneous standard.)

mind about answering questions without an attorney. *See Poyner v. Murray*, 964 F.2d 1404, 1411 (4th Cir.1992) (The defendant's question, "Didn't you tell me I had the right to an attorney?", was not a request for an attorney; the question contained no expression of a present desire to speak with an attorney.), *cert. denied,* — U.S. —, 113 S.Ct. 419, 121 L.Ed.2d 342 (1992). To give appellant's question a contrary meaning, by concluding that it actually expressed a present desire for the assistance of an attorney in answering the customs agents' questions, would be to "disregard the ordinary meaning of th[e] request." *McNeil*, 501 U.S. at —, 111 S.Ct. at 2209, 115 L.Ed.2d at 169.

Appellant's cause is not aided by his reference to cases dealing with interpretation of ambiguous or equivocal requests for an attorney. Although, as appellant suggests, we give a broad rather than a narrow interpretation to a defendant's request for counsel, "interpretation is only required where the defendant's words, understood as ordinary people would understand them, are ambiguous." *Connecticut v. Barrett*, 479 U.S. 523, 529, 107 S.Ct. 828, 832, 93 L.Ed.2d 920 (1987). Given its ordinary meaning, the question asked by appellant was clear and unambiguous.

Appellant contends that his question regarding an attorney is virtually identical to one made by the defendant in *United States v. Giles*, 967 F.2d 382, 386 (10th Cir.1992). In *Giles*, the defendant asked after being advised of his *Miranda* rights "when he would be given the opportunity to talk to an attorney." *Id.* at 385. The district court in that case found that the defendant desired to speak to an attorney and "only wondered about the procedure relating to such a request." *Id.* at 386. We upheld this finding under the clearly erroneous standard and concluded that the defendant's question could be reasonably construed as a request for an attorney. *Id.* We reversed the order of the district court, however, because it had found that the defendant, after invoking the right to an attorney, was again informed of his *Miranda* rights and had proceeded to waive them. We noted that under *Edwards*, the police must cease all interrogation once the defendant invokes the right to an attorney. *Id.*

There is a significant difference between the question asked in *Giles* and the question asked in the instant case. In *Giles*, the question could be interpreted as an expression of a present desire to speak to an attorney. The question asked by appellant, on the other hand, contains an expression of a present desire *not* to speak with an attorney. Simply put, this is the difference between requesting an attorney and not requesting one. We agree with the district court that appellant did not invoke the right to speak with an attorney during his interrogation.

### IV. *Conclusion.*

The district court's order denying the motion to suppress was proper. The judgment of the district court is therefore AFFIRMED.