**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Miguel Angel RAMOS–SAENZ,**
**Defendant–Appellee.**

No. 93–50759.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 1, 1994.

Decided Sept. 13, 1994.

As Amended Oct. 14, 1994.

---

**60**

Rebecca S. Dewees, Asst. U.S. Atty., Los Angeles, CA, for plaintiff-appellant.

Pedro V. Castillo, Deputy Federal Public Defender, Los Angeles, CA, for defendant-appellee.

\* The Honorable Robert R. Merhige, Jr., Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

Before: O'SCANNLAIN and T.G. NELSON, Circuit Judges; MERHIGE, Jr.,\* District Judge.

O'SCANNLAIN, Circuit Judge:

We must decide whether the search of an individual's shoes immediately after clearing airport customs is a routine border search.

**I**

On July 22, 1993, Miguel Angel Ramos–Saenz arrived at Los Angeles International Airport on a direct flight from Guadalajara, Mexico. In the customs area of the terminal, Senior Customs Inspector Charles Carlson stopped Ramos–Saenz after noticing his bright, white tennis shoes. Inspector Carlson wrote on Ramos–Saenz' declaration card that his shoes should be checked at the secondary customs inspection area. Ramos–Saenz then proceeded to the secondary inspection area where Inspector William Allen Owens was stationed. Inspector Owens performed a cursory check of Ramos–Saenz but did not search his shoes. Finding nothing suspicious Inspector Owens signed Ramos–Saenz' customs declaration, indicating that he had been checked. As Ramos–Saenz walked toward the customs area exit, Inspector Carlson again noticed Ramos–Saenz and called for him to stop. Inspectors Carlson and Gerald Niemeyer then showed Ramos–Saenz to a private inspection room and asked him to remove his shoes. The Inspectors discovered approximately 526 grams of heroin hidden within the soles of the shoes as well as in a pair of shoes Ramos–Saenz carried in his bag.

On August 6, 1993, Ramos–Saenz was charged with importation of and possession with intent to distribute heroin. Ramos–Saenz filed a motion to suppress the heroin found in both pairs of shoes on the ground that the search and seizure conducted at the airport was unreasonable. At the hearing on the motion to suppress, the district court concluded that Inspectors Carlson and Niemeyer violated Ramos–Saenz' Fourth

Amendment rights and granted the motion to suppress. The government appeals this decision.

## II

■ The government contends that the search of Ramos–Saenz' shoes and baggage was a routine border search which requires no justification. Ramos–Saenz argues that the search violated his Fourth Amendment rights contending it was a non-routine border search requiring reasonable suspicion.[1]

■ Neither the government nor Ramos–Saenz disputes that the search of Ramos–Saenz' shoes and baggage was a border search conducted at the "functional equivalent" of the border.[2] Routine searches at a United States international border require no objective justification, probable cause or warrant. *United States v. Montoya de Hernandez,* 473 U.S. 531, 538, 105 S.Ct. 3304, 3309, 87 L.Ed.2d 381 (1985).

The dispute here centers on whether the search of Ramos–Saenz' shoes and baggage constituted a routine search. Although routine border searches may proceed without probable cause or justification, "reasonable suspicion is required for the detention of a traveler at the border 'beyond the scope of a routine customs search and inspection.'" *United States v. Sandoval Vargas,* 854 F.2d 1132, 1134 (9th Cir.) (quoting *Montoya de Hernandez,* 473 U.S. at 541, 105 S.Ct. at 3310), *cert. denied,* 488 U.S. 912, 109 S.Ct. 270, 102 L.Ed.2d 257 (1988). Ramos–Saenz contends that the search of his shoes and baggage was non-routine. He argues that, because Inspector Owens signed Ramos–Saenz' customs declaration, Ramos–Saenz cleared customs and any subsequent search was non-routine, requiring a reasonable suspicion. The government contends that the

search of Ramos–Saenz' shoes and baggage "did not go beyond routine."

■ Although we have never defined the exact dimensions of a routine border search, we have stated that the degree of intrusiveness is a critical factor in distinguishing between routine and non-routine searches.[3] *Sandoval Vargas,* 854 F.2d at 1134. Our past decisions highlight types of border searches that are so intrusive that they require at least reasonable suspicion. For example, in *United States v. Couch,* 688 F.2d 599, 604 (9th Cir.), *cert. denied,* 459 U.S. 857, 103 S.Ct. 128, 74 L.Ed.2d 110 (1982), we held that a strip search at the border requires "real suspicion," and that a body cavity search at the border requires a "'clear indication' that the suspect is carrying contraband in a body cavity." And, in *United States v. Summerfield,* 421 F.2d 684, 685 (9th Cir.1970), we decided that "an intrusion into an individual's body requires a 'clear indication' that desired evidence will be found." These decisions are consistent with the Supreme Court's statement that strip searches, body cavity searches, and involuntary x-ray searches are examples of non-routine border searches. *Montoya de Hernandez,* 473 U.S. at 541 n. 4, 105 S.Ct. at 3310 n. 4. Our cases hold that a border search goes beyond the routine only when it reaches the degree of intrusiveness present in a strip search or body cavity search.

Such is not the situation here. Border searches involving the removal of shoes do not entail the degree of intrusiveness present in strip and body cavity searches. *See United States v. Grotke,* 702 F.2d 49, 52 (2d Cir.1983); *United States v. Fitzgibbon,* 576 F.2d 279, 284 (10th Cir.), *cert. denied,* 439 U.S. 910, 99 S.Ct. 279, 58 L.Ed.2d 256 (1978). Inspector Carlson's minimally intrusive request that Ramos–Saenz remove his shoes

1. The government and Ramos–Saenz agree that no reasonable suspicion existed to justify the search.

2. Although the government discusses the difference between a functional equivalent border search and an extended border search, Reply Brief, 3–6, this distinction is not pertinent to the case because neither party disputes that the search occurred at the functional equivalent of the border. *See Almeida–Sanchez v. United*

*States,* 413 U.S. 266, 272–73, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973) (discussing "functional equivalent" border searches).

3. Intrusiveness includes both the extent of a search as well as the degree of indignity that may accompany a search. *United States v. Vega–Barvo,* 729 F.2d 1341, 1345 (11th Cir.), *cert. denied,* 469 U.S. 1088, 105 S.Ct. 597, 83 L.Ed.2d 706 (1984).

was well within the scope of a routine border search.

Ramos–Saenz' argument that the search was non-routine because he had cleared customs is also without merit. Functional equivalent border searches may occur after the individual or thing has crossed over and left the functional border. *See United States v. Ogbuehi,* 18 F.3d 807, 813 (9th Cir.1994) (valid search of defendant occurred minutes after he passed through customs and walked outside the Customs building); *United States v. Palmer,* 575 F.2d 721, 723 (9th Cir.) (valid search of defendant occurred five to seven minutes after she passed through customs, left customs enclosure and proceeded to baggage claim area), *cert. denied,* 439 U.S. 875, 99 S.Ct. 212, 58 L.Ed.2d 189 (1978); *United States v. Mejias,* 452 F.2d 1190, 1193 (9th Cir.1971) (valid search of defendant's baggage occurred an hour and a half after defendant and his baggage passed through customs and were waiting outside customs enclosure). Since Ramos–Saenz had not even left the customs check point area, the search of his shoes did not require any justification.

### III

The search of Ramos–Saenz' shoes and baggage was a routine border search, and no reasonable suspicion was necessary. We vacate the district court's grant of the motion to suppress evidence found pursuant to that search and remand for trial.

VACATED and REMANDED.