KOZINSKI, Circuit Judge.
Looking for contraband, customs agents removed and dismantled Jose Molina-Tar-azon’s fuel tank. We consider whether this procedure is a “routine” border search for which no suspicion whatsoever is required.
I
At approximately 3:30 one early morning, Molina entered the United States from Mexico driving a pickup truck. Molina was directed to secondary, where Customs Inspector Kevin Brown ordered a narcotics-trained dog to sniff the truck. When the dog failed to alert, Brown inspected the truck’s undercarriage with an *712 autocreeper.[1] Brown then turned his attention on the gas tank.
Brown first tried to look into the tank with a fiberoptic scope,[2] but was stopped by an anti-siphoning valve.[3] He then summoned an off-site contracting mechanic, who arrived fifteen or twenty minutes later. The mechanic hoisted the truck onto a lift and removed several bolts and straps that connected the tank to the truck, disengaging electrical connections and hoses in the process. The mechanic then removed the sensing unit, revealing thirty-one packages of marijuana inside the tank.
Charged with violating 21 U.S.C. §§ 841(a)(1), 951 and 960, Molina challenged the search on the grounds that the government lacked reasonable suspicion. The government argued that it needed no suspicion because the search was routine. The district court held that, even if the search was not routine, the officers had reasonable suspicion based on unnatural mud patterns they observed during their visual inspections of the gas tank. Molina entered a conditional guilty plea and now appeals the district court’s suppression ruling.
II
While the Fourth Amendment generally prohibits warrantless searches without probable cause, it is subject to a few narrow and well-delineated exceptions. One such exception is the border search. Carroll v. United States, 267 U.S. 132, 154, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Authorized by the same Congress that proposed the Fourth Amendment, the border search has a long history of judicial and public acceptance. See 4 Wayne R. LaFave, Search and Seizure § 10.5(a), at 531, 535 (3d ed.1996).[4] As the Supreme Court has observed, “[b]order searches ... [are] considered to be ‘reasonable’ by the single fact that the person or item in question ha[s] entered into our country from outside.” United States v. Ramsey, 431 U.S. 606, 619, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). Pursuant to this exception, routine searches of persons and their effects entering the country may be conducted without any suspicion whatsoever. United States v. Montoya de Hernandez, 473 U.S. 531, 537-38, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985).
But border searches are not exempt from the irreducible constitutional requirement of reasonableness. The border search exception therefore authorizes only routine searches; it does not authorize any kind of search in any manner whatsoever. In order to conduct a search that goes beyond the routine, an inspector must have a reasonable suspicion that the person to be searched may be carrying contraband. United States v. Ramos-Saenz, 36 F.3d 59, 61 (9th Cir.1994).
*713 While we have never defined the limits of a routine search, we have observed that the critical factor is the degree of intrusiveness it poses. Id. at 61. This is consistent with the approach of several other circuits, which have held that the distinction between “routine” and “nonroutine” turns on the level of intrusiveness. See, e.g., United States v. Uribe-Galindo, 990 F.2d 522, 525-26 (10th Cir.1993); United States v. Braks, 842 F.2d 509, 511-12 (1st Cir.1988). Our caselaw recognizes four categories of searches as being so intrusive as to be clearly nonroutine: Body cavity, strip, pat down and involuntary x-ray searches. See Montoya de Hernandez, 473 U.S. at 541 n. 4, 105 S.Ct. 3304; United States v. Vance, 62 F.3d 1152, 1156 (9th Cir.1995). By contrast, we have held that searches of handbags, luggage, shoes, pockets and the passenger compartments of cars are clearly routine. See Montoya de Hernandez, 473 U.S. at 538, 105 S.Ct. 3304; Ramos-Saenz, 36 F.3d at 61-62; United States v. Sandoval Vargas, 854 F.2d 1132, 1134 (9th Cir.1988); United States v. Palmer, 575 F.2d 721, 723 (9th Cir.1978).
In Ramos-Saenz we observed that a border search goes beyond the routine “only when it reaches the degree of intrusiveness present in a strip search or body cavity search.” Ramos-Saenz, 36 F.3d at 61. The government seizes on this phrase to argue that a border search is always routine unless it involves a search of the person; at oral argument government counsel went so far as to assert that “the border search authority gives the government the right to dismantle a car with no reasonable suspicion whatsoever.” Were we to accept this argument, it would mean that customs agents at the border could, acting on no suspicion, order a car disassembled down to the last o-ring, and hand it back to the owner in a large box. We think not. We hold, rather, that some searches of inanimate objects can be so intrusive as to be considered nonroutine.
Determining when an inanimate object search becomes as intrusive as a body search is tricky. Object searches certainly do not cause the same degree of personal indignity as searches of the human body. But causing indignity is just one way a search can be intrusive; there are others. We write on a relatively clean slate because we have never identified what factors render the search of an object nonrou-tine. However, our analysis is informed by factors we consider in the border search context, as well as those from our general Fourth Amendment jurisprudence.
Ill
Three aspects of the search here render it nonroutine: Force was used to remove and disassemble the fuel tank; the procedure involved some risk of harm; and someone whose vehicle was subjected to such a search is likely to feel a diminished sense of security.[5]
A. Use of Force
Courts that have considered searches of inanimate objects in the border context have found the use of force to be a critical factor in assessing intrusiveness. See United States v. Rivas, 157 F.3d 364, 367-68 (5th Cir.1998); United States v. Robles, 45 F.3d 1, 5 (1st Cir.1995). We have noted, albeit not in the border search context, that force is a factor that bears on the intrusiveness of the search. United States v. Perez, 37 F.3d 510, 516 (9th Cir.1994) *714 (observing that sniff search of a car is unintrusive because it involves no forcing of closed containers or sealed areas). Searches of inanimate objects that courts have held to be routine generally have not involved the use of force. See e.g., United States v. Uribe-Galindo, 990 F.2d 522 (9th Cir.1993).
While force is a factor in assessing a search’s intrusiveness, it is not disposi-tive. For example, if the lock is jammed on a suitcase or its owner refuses to present a key, agents have to employ some degree of force to gain access to its interi- or. But this fact alone does not render a search overly intrusive. Conversely, other types of searches for which force is not required have been deemed overly intrusive: No degree of force is required to effect an x-ray search or to issue an order to disrobe, both of which we have consistently found to be so intrusive as to be nonroutine. United States v. Ek, 676 F.2d 379, 382 (9th Cir.1982). While not disposi-tive, the use of force in conducting a search will weigh against finding the search routine.
What constitutes the use of force depends on the circumstances. Certainly, if the search requires breaking, drilling into or permanently altering a portion of the item being searched, that is a use of force. Similarly, if the search involves the use of tools and the application of physical force to those tools, this will also amount to the use of force.
The search of Molina’s truck required the use of tools. The mechanic hoisted the truck onto a lift, loosened the straps holding the tank to the chassis, disconnected the filler and the sending hoses, detached electrical connections, disengaged the fill neck and unscrewed the bolts. He then detached the tank itself by unscrewing the pump unit and removing the pressed in “bushing” which held the tank to the truck. All of those actions required the use of force and in their totality they raise the inference that this was not a routine search.
B. Danger
The Supreme Court has held that if a search poses a danger to the subject, this is a significant factor bearing on whether the search is reasonable under the Fourth Amendment. In Winston v. Lee, 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), the Court considered whether forcing a suspect to undergo minor surgery to remove a bullet was such a serious intrusion as to be unreasonable. In holding that it was, the Court noted that a crucial factor in analyzing the magnitude of a search’s intrusiveness “is the extent to which the procedure may threaten the safety or health of the individual.” Id. at 761, 105 S.Ct. 1611 (citing Schmerber v. California, 384 U.S. 757, 771, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966)) (emphasis added). The Court reached this conclusion despite a dispute over how much danger, if any, the surgery would actually pose.[6]
In Schmerber, the Court held that forcing a suspect to have his blood drawn was insufficiently intrusive to overcome society’s interest in preserving evidence of drunk driving. In reaching this conclusion, the Court focused on three factors: First, the procedure involved no risk, trauma or pain. Id. at 771, 86 S.Ct. 1826. Second, a physician — a licensed professional — performed the procedure in a hospital environment, according to accepted medical practices. Id. Third, having blood *715 drawn is “routine in our everyday li[ves]” and a requisite for many entering particular schools, professions and institutions (and therefore, presumably, did not involve a significant degree of risk). Id. at 771 n. 13, 86 S.Ct. 1826 (quoting Breithaupt v. Abram, 352 U.S. 432, 436, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957)).
In assessing the intrusiveness of border searches, we have also considered the dangerousness of the search. In Ek, concerns over the danger and potential long-term health effects posed by an x-ray search weighed heavily in our conclusion that x-ray searches were more intrusive than strip searches. We observed that being subjected to an x-ray search, although not as humiliating as being instructed to disrobe, is nonetheless more intrusive because of its potentially dangerous health consequences. Id. at 382. Notably, we came to this conclusion even though the record was silent on the danger or harmful effects associated with x-ray searches.
The border search jurisprudence of other circuits supports the view that the relative safety of various search methods is an important factor in the intrusiveness analysis. See United States v. Johnson, 991 F.2d 1287, 1292 (7th Cir.1993) (noting, as a factor in categorizing the search as routine, that it involved no harm); Braks, 842 F.2d at 512 (an important factor in determining whether a search is routine is “whether the type of search exposes the suspect to pain or danger”); United States v. Vega-Barvo, 729 F.2d 1341, 1345 (11th Cir.1984) (risk of injury is a factor entitled to independent consideration); United States v. Sandler, 644 F.2d 1163, 1167 (5th Cir.1981) (search at issue presented a relatively low degree of intrusiveness because it was, inter alia, not dangerous).
The search in this case presents a similar, and arguably more immediate, risk of danger than the x-ray in Ek.[7] An error in removing, disassembling and then reassembling the portion of a motor vehicle that contains a highly flammable and potentially explosive substance like gasoline might well result in disastrous consequences for the vehicle’s owner. For example, the mechanic charged with reattaching the hoses and electrical connections might fail to secure them properly, leading to a fuel leak that causes a fire or explosion. Or, he might not reattach the straps securing the tank to the body of the truck tightly enough, causing the tank to shake loose.[8] These examples do not represent an exhaustive list of the dangers associated with this type of search. Yet they provide ample support for the view that the search in this case created a risk of harm.
C. Fear
A third factor we consider is whether the search is psychologically intrusive. People’s minds are as vulnerable to intrusion as their physical possessions. As Justice Brandéis observed in Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928)
*716 The makers of our Constitution ... recognized the significance of man’s spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone — the most comprehensive of rights and the right most valued by civilized men.
Id. at 478, 48 S.Ct. 564 (Brandéis, J., dissenting).
The imposition of fear is a type of psychological intrusion. The Supreme Court has therefore recognized that the level of fear a particular search is likely to engender is a significant factor in evaluating its intrusiveness. In United States v. Ortiz, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975), the Court concluded that fixed checkpoints are “far less intrusive” than roving patrols, observing that the latter are more apt to “frighten[ ] or annoy[ ]” motorists. Id. at 894-95, 95 S.Ct. 2585. The Court reaffirmed its preference for fixed checkpoints in United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), noting that, in comparison to roving searches, “the subjective intrusion — the generating of concern or even fright on the part of lawful travelers — is appreciably less.” Id. at 558, 96 S.Ct. 3074. We read these cases for the proposition that government intrusions into the mind — specifically those that would cause fear or apprehension in a reasonable person — are no less deserving of Fourth Amendment scrutiny than intrusions that are physical in nature.
We conclude that the search conducted here would make a reasonable driver — one aware that a mechanic working for the government dismantled and reassembled a component critical to his vehicle’s safe operation — apprehensive about getting back into his vehicle and continuing on his way. The driver’s apprehension would certainly be heightened if he faced the prospect of driving a long distance at high speed. The diminished sense of personal security associated with driving a potentially unsafe one-and-a-half ton automobile is exactly the type of unwarranted psychological intrusion against which the Fourth Amendment was meant to protect.
The type of search conducted here could contribute to a driver’s apprehension in various ways. First, the work was performed by a government contractor whose qualifications, reputation and expertise are unknown to the vehicle’s owner, rather than by a mechanic the owner knows and trusts. The owner does not know whether the contractor is licensed to perform the work or what standards, if any, were used in selecting him. The owner is unable to choose a mechanic in whom he does have confidence.
Second, the driver might doubt the mechanic’s incentive to take adequate precautions in dismantling and reassembling portions of the vehicle, considering that the mechanic’s objectives are materially different in the border search context than in a traditional market setting. The mechanic lacks the independent incentive to undertake the procedures with the caution, skill and precision he might exercise if the owner were a repeat customer; those having their vehicles searched at the border are unlikely to return for additional work in the future. The mechanic’s concern is to remove and dismantle parts quickly, so that the agents can search for contraband; if they come up emptyhanded, the mechanic’s primary concern will be to finish the job promptly, not necessarily to reassemble the vehicle with the greatest care.
*717 Finally, a search as extensive as the one performed on Molina’s truck — one involving the dismantling and reassembling of components critical to the vehicle’s functioning and safe operation — leaves the normal driver unable to confirm whether everything is restored to its original state. Absent special expertise, the driver has no way of verifying the correct reassembly of the fuel tank. If the pump unit is returned to its original position within the tank, and the tank is then reconnected via straps, bolts and hoses, the driver has no way to tell whether the tank and related mechanisms are in a safe working condition. In contrast to less intrusive techniques that employ minimal force or allow for ready inspection by the layperson, where the search includes the dismantling of a mechanical part in the motor vehicle, the driver has little independent opportunity to allay his fear that the vehicle may leave him stranded on the freeway — or far worse.
‡ ‡ ‡ ‡ ‡
The use of force required to effect the tank’s removal, coupled with the potential danger associated with driving a vehicle after a component vital to its proper functioning is dismantled and reassembled, and the consequent diminution in the driver’s sense of personal security, results in a significant degree of intrusiveness. We conclude that the removal, disassembly and search of Molina’s fuel tank was not a routine search.
IV
That the search was not routine does not necessarily render it unlawful. The search would still have been lawful if the officers conducted it based on a reasonable suspicion that Molina might have been concealing contraband. See United States v. Teague, 18 F.3d 807, 812-13 (9th Cir.1994). We therefore consider whether the customs agents had reasonable suspicion to justify the search.
At the primary inspection area, Customs Inspector George Volz took a look around the truck for signs of smuggling. Looking through the fender well, Volz observed an unusual distribution of mud in the areas of the truck’s undercarriage surrounding the gas tank: While there was a lot of mud on top of the tank’s sensing unit, the rest of the unit was entirely clean. Volz discovered an abundance of mud lodged in out-of-the-way spaces behind the bolts that attached the tank to the undercarriage of the truck. The hoses connecting the tank to the truck also had splattered mud. Volz found that the mud did not appear to have been “splattered” naturally, but instead appeared to have been sprayed on with a paint gun or pressure hose.[9] The unnatural looking distribution and application of the mud suggested to Volz that someone had recently tampered with the tank. Inspector Volz also observed that the gas hoses looked freshly replaced — another factor that, in his experience, suggested recent removal of the tank. Based on these observations, he directed Molina to secondary. There, Inspector Brown observed the same unnatural mud distribution and application — in particular the fact that the tank’s sensing unit was too clean in relation to the rest of the tank — and came to the same'conclusion as Volz. He therefore examined the undercarriage of *718 the truck and observed patterns of mud and clamp marks that indicated the sensing and pump units had recently been removed. These observations provided reasonable suspicion to justify the dismantling of Molina’s fuel tank.
Accordingly, the search was lawful and the information gained from it could lawfully be used to prosecute Molina. The district court did not err in denying the suppression motion.
AFFIRMED.

. An autocreeper is a mirror attached to the end of a long pole with which one can view the undercarriage of a vehicle.

. Brown testified that a fiberoptic scope is similar to a telescope with six feet of light-carrying cable that the operator can feed into the fill neck.

. A manufacturer-installed device consisting of a ball that prevents insertion of a solid object into the gas tank.

. The border search exception is codified at 19 U.S.C. § 1581(a), which provides that
"Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States ... or at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers, and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.”

. These happen to be the factors relevant in our case. We do not rule out the possibility that other factors, such as protracted delay in completing the search, may render a search nonrontine.

. In Winston, there was testimony that the surgery would require only a small incision and could be performed under local, as opposed to general, anesthesia. 470 U.S. 753, 763-64 & nn. 7-8, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985).

. While the record does not address the danger associated with driving a vehicle after certain critical internal parts have been dismantled and reattached, the point is not one that requires much documentation. The government seems to acknowledge that different searches implicate different kinds of risks: In urging that the use of the fiberoptic scope was part of a routine search, for example, the government’s brief noted that such devices allow for the inspection of cars without damaging them.

. These risks need not come to fruition in every case. It is sufficient that, if the search is repeated, the risks will materialize on occasion, such as when the mechanic employed to do the work is careless or unskilled.

. Inspectors Volz and Brown both testified that they had extensive on-the-job training in the different types of mud application techniques employed by contraband smugglers, and that when mud is unnaturally applied, it tends to run before drying. Agent Volz also testified that unnaturally applied mud lacks the "fine white mist” characteristic of mud that splatters on vehicles naturally.