Present: Kinser, C.J., Lemons, Goodwyn, Millette, and Mims, JJ.,
and Lacy and Koontz, S.JJ.

COMMONWEALTH OF VIRGINIA

v.  Record No. 110775          OPINION BY JUSTICE WILLIAM C. MIMS
                                    January 13, 2012
JERROD TYREE QUARLES

                FROM THE COURT OF APPEALS OF VIRGINIA

     In this appeal, we review the en banc judgment of the Court of

Appeals, which reversed the denial by the Circuit Court of the City

of Richmond of a motion to suppress and held that the defendant's

confession was obtained in violation of his Miranda rights under the

Fifth Amendment of the United States Constitution.

                    FACTS AND PROCEEDINGS BELOW

     On October 21, 2008, Jerrod T. Quarles and then 11-year-old

K.T. decided to "rob a white lady" near the area of Virginia

Commonwealth University in Richmond.  The first person they

encountered was Kimberly Johnson, who was walking home and talking

on her cellular telephone.  Quarles asked K.T. for his shirt, which

Quarles used to wrap a brick.  Quarles struck Johnson in the head

with the brick.  Johnson fell to her knees.  K.T., wielding a knife

that Quarles had provided him, demanded Johnson's phone, which

Johnson gave to him.  Johnson then chased Quarles and K.T. for six

or seven blocks and later called police.

     Hours later, Detective Michael Alston visited K.T.'s home and

spoke with his mother and later with K.T.  K.T. and his mother led

police to Johnson's cellular telephone and to the knife that K.T. used during the robbery. K.T. provided an address where Quarles was located. Quarles was placed under custodial arrest and brought to the precinct.

At the precinct, Detective Alston took K.T. into his lieutenant's office for interrogation. Quarles remained in a larger, open office with Officer Darin Papeo. Detective Alston spoke with K.T. for 45 minutes to an hour and obtained a full confession. He then obtained a full confession from Quarles. Quarles was placed under arrest and subsequently indicted for robbery and conspiracy to commit robbery in violation of Code §§ 18.2-22 and 18.2-58.

Prior to trial, Quarles moved to suppress the evidence on the grounds that Detective Alston obtained the confession in violation of his Miranda rights under the Fifth Amendment of the United States Constitution. At the suppression hearing, Detective Alston testified that following his interview of K.T., he walked into the hallway and saw Officer Papeo and Quarles in the large open office. Officer Papeo approached Detective Alston with a waiver of rights form and stated that Quarles wished to talk to an attorney.[1] Quarles was sitting approximately 10 or 15 feet away. At this time, the evidence against Quarles consisted of Johnson's cellular telephone,

---

[1] The parties do not dispute that Quarles had invoked his Miranda rights when speaking with Officer Papeo.

2

the knife used in the robbery, and a full, detailed confession from K.T. Detective Alston also was aware of two independent witnesses with whom he had not yet spoken, as well as Johnson, the victim, who presumably could identify Quarles as her attacker.

Detective Alston testified that in response to Officer Papeo's statement, he said to Officer Papeo: "[T]hat's fine if he doesn't want to talk to me. I wasn't the person that robbed a white lady and hit her in the head with a brick." He explained that at the time of that statement, he believed nothing remained to be done in the investigation of Quarles, and that "the case was made." Quarles, upon hearing Detective Alston's statement, expressed a desire to speak with him. Detective Alston responded, "no, that's fine, you don't have to talk to me. I'm good." Quarles persisted, and later made a full confession.

On cross-examination, Detective Alston was asked if he also said "If that's the story you want to tell the judge, that's fine." He responded that he may have. He indicated that his recollection was limited since he had not recorded the conversation. He explained that he used the term "white lady" because K.T. had used that term and it was "in his head" from K.T.'s confession. He testified that while his statement was not part of the booking process, it was not out of the ordinary under the circumstances.

At the conclusion of the hearing, the circuit court made the following findings of fact:

> I find that Detective Alston's statement to [Officer] Papeo, having learned that the defendant, Mr. Quarles, declined to be interviewed and asked for his attorney, the statement ["]that's fine. I'm not the person who robbed the white lady and hit her in the head with a brick["] and the statement that may have followed that ["]if that's the story he wants to tell the judge, then, that's fine,["] those statements were said by Detective Alston to [Officer] Papeo in response to what [Officer] Papeo had said to Detective Alston.

(Emphasis added.) The circuit court then found that the statements were not a re-initiation of interrogation or the functional equivalent of interrogation, and that Quarles' confession was initiated by Quarles. It denied Quarles' motion to suppress the confession.

Following a bench trial, the circuit court found Quarles guilty of robbery and conspiracy to commit robbery. Quarles appealed to the Court of Appeals. A divided panel of that court affirmed his convictions. See Quarles v. Commonwealth, Record No. 1988-09-2, (Aug. 10, 2010). The Court of Appeals granted his petition for en banc review and reversed the judgment of the panel, holding that the circuit court erred in denying Quarles' motion to suppress. Quarles v. Commonwealth, 58 Va. App. 13, 26, 707 S.E.2d 7, 13 (2011). The Court of Appeals also rejected the trial court's finding that Detective Alston used the pronoun "he" rather than "you" when suggesting that Quarles could maintain his innocence "to the judge." Id. at 18 n.1. We granted the Commonwealth's petition for appeal, and now reverse.

4

DISCUSSION

The Commonwealth assigns error to the Court of Appeals holding that the police impermissibly reinitiated communication with Quarles after he invoked his right to counsel in violation of his rights under the Fifth Amendment, and that Quarles' subsequent waiver of his Miranda rights therefore was not voluntary.[2]

The question of whether Detective Alston's statement violated Quarles' Fifth Amendment rights is a mixed question of law and fact. See Brooks v. Commonwealth, 282 Va. 90, 94, 712 S.E.2d 464, 466 (2011). We review the circuit court's factual findings in denying a motion to suppress for clear error, but review its application of the law de novo. Id. at 94-95, 712 S.E.2d at 466; see also Commonwealth v. Redmond, 264 Va. 321, 327, 568 S.E.2d 695, 698 (2002) (" 'the determination of what [the defendant] actually said is a question of fact that we review only for clear error. . . . Whether those words are sufficient to invoke the right to counsel is a legal determination that we review de novo.' ") (quoting United States v. Uribe-Galindo, 990 F.2d 522, 523 (10th Cir. 1993)).

---

[2] The Commonwealth does not assign error to the Court of Appeals' holding that Detective Alston used the pronoun "you" rather than "he" and therefore has abandoned any argument on that issue before this Court. See Dowdy v. Commonwealth, 278 Va. 577, 597 n.16, 686 S.E.2d 710, 721 n.16 (2009) (due to failure to assign error to a Court of Appeals' holding, argument not before this Court). See Rule 5:17(c)(1)(i) ("Only assignments of error assigned in the petition for appeal will be noticed by this Court.").

The legal principles that govern the outcome of this case are familiar and largely not disputed by the parties.  The Fifth Amendment of the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  When police interrogate a suspect in their custody, they first must give a Miranda warning informing the suspect of the right to an attorney and the right to have that attorney present during the interrogation.  Miranda v. Arizona, 384 U.S. 436, 469-73 (1966).  If the suspect invokes the right to counsel, the interrogation must cease until an attorney has been made available to the suspect or the suspect reinitiates the interrogation.[3]  Redmond, 264 Va. at 328, 568 S.E.2d at 698 (applying Edwards v. Arizona, 451 U.S. 477, 484-85 (1981)); see also Correll v. Commonwealth, 232 Va. 454, 462, 352 S.E.2d 352, 356 (1987) (once a suspect invokes the right to counsel, "further discussions between the police and the accused must [be] initiated by the accused.").

The narrow question this case presents is whether Quarles reinitiated the interrogation or whether Detective Alston engaged Quarles in interrogation or its functional equivalent.  See Rhode

---

[3] If the police initiate a subsequent interrogation, "the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial," even where the suspect executes a waiver.  McNeil v. Wisconsin, 501 U.S. 171, 177 (1991).  This rule is " 'designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights.' "  Id. (quoting Michigan v. Harvey, 494 U.S. 344, 350 (1990)).

6

Island v. Innis, 446 U.S. 291, 300-01 (1980).  The United States Supreme Court's holding in Innis controls the outcome of this case.

In Innis, the police, in the course of investigating a murder and a robbery committed by a man using a sawed-off shotgun, arrested Innis, who was unarmed.  Id. at 293-94.  After being advised of his Miranda rights, and having asked to speak to a lawyer, Innis was placed in a "caged wagon" with three officers for transport to the police station.  Id. at 294.

While en route to the station, one of the officers said to another officer that because there was a school for handicapped children nearby, " 'there's a lot of handicapped children running around in this area, and God forbid one of them might find a weapon with shells and they might hurt themselves.' "  Id. at 294-95.  The other officer responded that " 'it would be too bad if the little . . . girl [] would pick up the gun, maybe kill herself.' "  Id. at 295.  Innis then interrupted to show the officers the location of the shotgun.  Id.

The Innis court observed that under Miranda, police need not engage in express questioning for the exchange to constitute interrogation.  Id. at 299.  However, the Court noted that not all statements obtained by police after a person is taken into custody are the product of interrogation.  Rather, " '[i]nterrogation,' as conceptualized in the Miranda opinion, must reflect a measure of

7

compulsion above and beyond that inherent in custody itself." Id. at 300.

The Court set forth the following test to determine whether police conduct constitutes questioning for Miranda purposes:

> We conclude that the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . . A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.

Id. at 300-02 (emphasis added) (footnotes omitted). Applying this test, the Court held that Innis was not interrogated within the meaning of Miranda. Id. at 302.

The Court explained:

> That the officers' comments struck a responsive chord is readily apparent. Thus, it may be said . . . that the respondent was subjected to 'subtle compulsion.' But that is not the end of the inquiry. It must also be established that a suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response.

8

Id. at 303 (emphasis added); see also Arizona v. Mauro, 481 U.S. 520, 529 (1987) (recognizing "subtle compulsion" standard of Innis).

Under Innis, our inquiry, which "focuses primarily upon the perceptions of the suspect," Innis, 446 U.S. at 301, is whether Detective Alston should have known that his statement was "reasonably likely to elicit an incriminating response" from Quarles. Id. In concluding that he should have known, the Court of Appeals identified two aspects of Detective Alston's statement that distinguished it from Innis. First, part of the statement was directed at Quarles with the pronoun "you," whereas Innis involved a conversation ostensibly between two officers in the presence of Innis. Second, Detective Alston's use of the term "white lady" amounted to a specific warning to Quarles that K.T. had implicated him in the robbery.

We are not persuaded that these minor distinctions actually make a substantive difference. The possible use of the second-person "you" rather than third-person "he" alone does not make the statement the functional equivalent of an interrogation under Innis. While a second-person, direct address is different from the "dialogue between . . . two officers" considered in Innis, 446 U.S. at 302, it is the content of the entire statement in light of the circumstances that controls whether it was functionally the equivalent of interrogation. The statement here contained no implicit request for information or even for response. Rather, it

9

conveyed exactly the opposite: that the detective did not desire to hear Quarles' account and that Quarles could "tell [it to] the judge."  Such a statement, according to Detective Alston, while not part of the booking process, was not out of the ordinary based on the circumstances.  According to Innis, to constitute interrogation, the circumstances "must reflect a measure of compulsion above and beyond that inherent in custody itself."  446 U.S. at 300.  Simply put, we do not find compulsion in the use of the second-person personal pronoun in this context.  Even assuming, arguendo, some measure of compulsion, at best it was of the subtle variety approved by the United States Supreme Court and therefore acceptable under Innis.

Likewise we are not persuaded that the use of the term "white lady" created the functional equivalent of interrogation.  The Unites States Court of Appeals for the Fourth Circuit has previously approved the exposure of criminal suspects to information that could be interpreted as evidence of guilt.  In United States v. Payne, 954 F.2d 199, 201 (4th Cir. 1992) (vacated on other grounds), the defendant was riding in a car with three FBI agents en route to the United States Marshal's office.  Agent Martin, who was riding in the back seat beside Payne, received a call on the cellular car phone.  Id.  In that call, she learned "that a handgun had been found at Payne's residence during the execution of the search warrant."  Sometime thereafter, Agent Martin said to Payne, " 'They found a gun

10

at your house.' " Payne responded, " 'I just had it for my protection.' " Id.

In holding that the agent's statement was permissible under Innis, the court observed in Payne that "mere declaratory descriptions of incriminating evidence do not invariably constitute interrogation for Miranda purposes." Id. at 202. Rather, "[t]he inquiry mandated by Innis into the perceptions of the suspect is necessarily contextual, and whether descriptions of incriminating evidence constitute the functional equivalent of interrogation will depend on circumstances that are too numerous to catalogue." Id. at 203 (emphasis added) (citing Nelson v. Fulcomer, 911 F.2d 928, 934 (3d Cir. 1990)).

Other circuits adhere to the rule that exposure to inculpating evidence is not, by itself, interrogation. See e.g., United States v. Suggs, 755 F.2d 1538, 1541-42 (11th Cir. 1985) (no interrogation where defendant was shown a copy of his indictment and made a spontaneous exclamation concerning guilt); see also United States v. Peoples, 748 F.2d 934, 936 (4th Cir. 1984) (no interrogation where victim of shooting entered interrogation room and defendant immediately apologized for shooting him).[4]  Quarles may have inferred

---

[4] Other states interpret Innis as allowing such an exposure to evidence of guilt.  See, e.g., Smith v. State, 995 A.2d 685, 688-90 (Md. 2010) (no interrogation where officer showed defendant cocaine found in his bedroom); State v. Gibson, 422 N.W.2d 570, 572, 577 (Neb. 1988) (no interrogation where officer said, "Oh, look what I found" after discovering loaded revolver in the defendant's

11

that K.T. had confessed based on the use of the term "white lady."

However, based on the "necessarily contextual" inquiry, Payne, 954

F.2d  at 203, we do not find that such minor exposure to evidence

constitutes an event which is reasonably likely to elicit an

incriminating response under the circumstances present in this case.

In summation, considering the content and context of the

statement, we cannot say that Detective Alston should have known

that Quarles was likely to respond.  Unlike the conversation in

Innis, the statement here did not subtly invite Quarles to reveal a

missing piece of evidence.  To the contrary, Detective Alston

expressed that he did not need or desire Quarles' cooperation, which

was reasonable based on the extensive evidence he had gathered.

Unlike the circumstances reviewed in Innis, Quarles was not riding

in a "caged wagon" with three other officers at the time of the

statement.  Rather, the statement came in response to Officer Papeo

as the detective was passing from a hallway into a large office and

while Quarles remained 10 to 15 feet away.  And, as in Innis, there

is nothing in the record before us to show that Quarles was

"particularly susceptible" to such an exposure.  We therefore find

that the circuit court did not err in denying Quarles' motion to

suppress.

---

presence, and defendant responded by acknowledging his ownership of
the weapon).

CONCLUSION

For the reasons stated, we will reverse the judgment of the Court of Appeals and reinstate Quarles' convictions.

<u>Reversed and final judgment.</u>