UNITED STATES of America,
Plaintiff–Appellee,

v.

Alfonso CAMACHO, Defendant–
Appellant.

No. 02–50629.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 9, 2003.

Submission Withdrawn Nov. 24, 2003.

Resubmitted April 12, 2004.

Filed May 27, 2004.

Ellis M. Johnston III, Federal Defenders of San Diego, Inc., San Diego, CA, for the defendant-appellant.

Carol C. Lam, United States Attorney, Joseph S. Smith, Jr., Assistant United States Attorney, United States Attorney's Office, San Diego, CA, for the plaintiff-appellee.

Before: FISHER and BYBEE, Circuit Judges, and MAHAN, District Judge.*

---

* The Honorable James C. Mahan, United States District Judge for the District of Nevada, sitting by designation.

FISHER, Circuit Judge:

Alfonso Camacho, a United States citizen, appeals his conviction for importation of marijuana in violation of 21 U.S.C. §§ 952 and 960. He argues that the district court should have suppressed the marijuana Customs inspectors found during a border search of the vehicle Camacho drove to the San Ysidro, California, point of entry. At issue is the use of a radioactive density measuring device called a "Buster"—a relatively new technology the Customs Service has begun to use in border searches. Here, a Customs inspector used the Buster on the vehicle's spare tire while Camacho was still in the driver's seat. The Buster's reading led inspectors to search the spare tire, which contained marijuana.

■ We review de novo the denial of a motion to suppress, *United States v. Fernandez–Castillo*, 324 F.3d 1114, 1117 (9th Cir.2003), and a district court's determination of the legality of a border search, *United States v. Ani*, 138 F.3d 390, 391 (9th Cir.1998). We review for clear error, however, the district court's findings of fact. *See United States v. Mendoza–Ortiz*, 262 F.3d 882, 885 (9th Cir.2001).

The Supreme Court recently made clear that reasonable suspicion is usually not required for officers to conduct non-destructive border searches of property. *United States v. Flores–Montano*, —— U.S. ——, —— – ——, 124 S.Ct. 1582, 1585–87, 158 L.Ed.2d 311 (2004). Because there is no record evidence that the Buster posed any danger to Camacho or the vehicle he was driving, we affirm.

## I.

On March 22, 2002, Camacho was stopped in a sport utility vehicle ("SUV") at the San Ysidro, California, port of entry. The Customs inspector who initially searched the SUV referred Camacho to secondary inspection because the SUV's spare tire, located underneath the rear of the vehicle, felt solid when tapped with an aluminum flashlight.

At the secondary inspection area, a second Customs inspector confirmed the tire's solid feel and also observed that the spare tire was a different brand than the other four tires on the SUV. After unsuccessfully attempting to remove the spare tire from the SUV's undercarriage, he decided to use a Buster to assess whether anything was inside the tire. The inspector positioned himself underneath the SUV, placed the Buster on the tire and pressed its activating button. Camacho was in the SUV's driver's seat while the Buster was in use. After about three seconds of activation, the Buster registered a density reading of 62—rather than what the inspector's experience taught him was the normal range of 20 to the mid–30's. Because of this high reading, the inspector concluded that "there was obviously something inside the tire." The Customs inspectors then conducted a detailed search of the SUV, finding almost 108 pounds of marijuana hidden in the spare tire and elsewhere in the vehicle.

At the suppression hearing, the inspector who used the Buster testified that he had received approximately one hour of training on the use of Busters to identify hiding places for narcotics. This training did not include instruction in the proper maintenance of Busters. He also indicated that he uses the Buster several times a week but is not required to wear protective clothing when he does so.

The suppression hearing also included testimony from Richard Whitman, the radiation safety officer for the Customs Service. Whitman, the only expert to testify at the hearing, explained that Busters are being used at the nation's borders with increasing frequency. He described them as follows:

A Buster is a hand-held portable density gauge. It is roughly six inches by two and a half inches by two and a half inches. It is largely black in color. It weighs about two and a half pounds. It contains a tiny bead of radioactive material called barium 133 that's inside a sealed container. The container is made of tungsten. And when the actuating trigger is pushed, the container rolls to an open slot and exposes the radiation in a forward direction.

According to Whitman, "when the Buster is placed on a solid object and activated, the more solid the object that it's against, the more radiation is reflected back to the detector. The detector then makes an estimate of how much radiation is reflected back and displays it on a screen on a relative scale." A higher number indicates a denser object. The radiation emitted by a Buster is in the form of gamma rays, which may penetrate but do not affect the object to which the Buster is applied. Whitman testified that the hour of training the Customs inspector received was adequate preparation for using Busters.

Approximately 96 percent of the Busters Customs uses measure 10 microcuries in strength. The other four percent are older models that initially measured 100 microcuries but that now measure somewhat less due to the half-life of barium 133. Whitman testified that the radiation emitted from both types of Busters complies with federal standards for safe exposure. See 10 C.F.R. § 20.1301(a)(2) (providing the maximum hourly radiation dose limit for members of the public). Further, the actual radiation exposure from Busters is extremely low, given that they are generally used for only several seconds at a time. Thus, for example, radiation exposure from a Buster is significantly less than that from a typical chest x-ray and is equivalent to a smoke detector. Whitman equated the radiation exposure due to the use of a Buster to so-called "background radiation," to which people are exposed in their daily lives. Finally, given the distance and material between the spare tire and driver's seat in Camacho's SUV, Whitman concluded that given Camacho's location in the vehicle, Camacho could not possibly have been exposed to any radiation the Buster emitted during the search.

Whitman testified that Busters require very little maintenance. Specifically, a Buster's user must change the battery only when necessary. Inspectors are not required to wear safety equipment when using a Buster, although Busters do bear labels warning of the presence of radioactive material. Customs employees are not authorized to touch or remove the barium inside the Buster. If a Buster is damaged, it must be put in its case and the inspector must call a hotline for further instruction. Whitman noted, however, that "[w]e've never had one fail." He testified that Busters do not need to be checked regularly for leaks or cracks because of the low amount of radiation they emit and their unblemished track record.

## II.

Camacho contends that the use of the radioactive Buster device on his SUV's spare tire violated the Fourth Amendment's protection against unreasonable searches and seizures. He does not argue with Whitman's assessment of a properly functioning Buster, but instead urges that their use exposes individuals to the risk of detrimental levels of radiation if the Buster is malfunctioning or damaged. Relying on this potential danger, he argues that Buster searches must be justified by reasonable suspicion. He looks primarily to our decision in *United States v. Molina–Tarazon*, 279 F.3d 709 (9th Cir.2002), which dealt with border searches of a vehicle's gas tank and was the law of this Circuit at the time this case was argued.

In requiring reasonable suspicion, *Molina–Tarazon* looked to (1) the force used to disassemble a car's gas tank, (2) the risk of harm to a car's occupants and (3) the likelihood that "someone whose vehicle was subjected to such a search is likely to feel a diminished sense of security." *Id.* at 713.

■ The Supreme Court has now disapproved *Molina–Tarazon*, however, stating that "the reasons that might support a requirement of some level of suspicion in the case of highly intrusive searches of the person ... simply do not carry over to vehicles." *Flores–Montano,* —— U.S. at ——, 124 S.Ct. at 1585; *see United States v. Bennett,* 363 F.3d 947, 951 (9th Cir. 2004). Specifically addressing the removal and reinstallation of gas tanks, the Supreme Court observed that such actions are "justified by the Government's paramount interest in protecting the border.... While it may be true that some searches of property are so destructive as to require a different result, this was not one of them." *Flores–Montano,* —— U.S. at ——, 124 S.Ct. at 1587.

■ The Buster search at issue here was not destructive. As in *Flores–Montano,* "[Camacho] does not, and on the record cannot, truly contend that the procedure [at issue] ... in this case or any other has resulted in serious damage to, or destruction of, the property." *Id.* at 1586. Indeed, it is undisputed that the gamma rays emitted by Busters do not affect the objects at which they are aimed. Not only has Camacho failed to show any past incident in which a Buster damaged property, he has not even alleged that such an incident could occur in the future. *Cf. United States v. Okafor,* 285 F.3d 842, 845 (9th Cir.2002) ("[A]n x-ray examination of luggage ... does not harm the baggage. Nor should anyone be afraid to use a suitcase merely because it has been scanned by an x-ray.").

■ Nonetheless, a suspicionless border search is unconstitutional if it involves a "highly intrusive search[ ] of the *person.*" *Flores–Montano,* —— U.S. at ——, 124 S.Ct. at 1585 (emphasis added). Before the Supreme Court's *Flores–Montano* decision, we weighed the diminished sense of security felt by the defendant in assessing a search's intrusiveness. *See Molina–Tarazon,* 279 F.3d at 713. Under this regime, Camacho's fear of harmful radiation to himself from a malfunctioning Buster might have been a relevant consideration. In *Flores–Montano,* however, the Supreme Court concluded that such "[c]omplex balancing tests ... have no place in border searches of vehicles." —— U.S. at ——, 124 S.Ct. at 1585. Moreover, the Court emphasized that mere speculation about a search's risks, without supporting evidence, cannot support a reasonable suspicion requirement. *Id.* at 1586–87. Thus, it is not significant for our Fourth Amendment inquiry that Camacho simply may have feared that the Buster search was unsafe.

Under our Ninth Circuit precedent that survives *Flores–Montano,* however, border searches that *actually* risk exposing defendants to harmful radiation—as opposed to the mere apprehension of radiation exposure—do raise Fourth Amendment concerns. Although the Supreme Court has "suggest[ed] no view on what level of suspicion, if any, is required for nonroutine border searches such as strip, body cavity, or involuntary x-ray searches," *United States v. Montoya de Hernandez,* 473 U.S. 531, 541 n. 4, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985), we have held that an x-ray search requires a heightened level of suspicion because it is "potentially harmful to the health of the suspect. It goes beyond the passive inspection of body surfaces."

*United States v. Ek,* 676 F.2d 379, 382 (9th Cir.1982).[1]

In this case, however, there is no record evidence that Camacho or any other motorist was ever exposed to "potentially harmful" levels of radiation from a Buster search. According to Whitman's testimony, the Buster's weak radioactivity, the brief period during which it was activated, Camacho's distance from the Buster and the material in between Camacho and the Buster ensured that Camacho was not exposed to any radiation at all from the Buster search. Camacho neither impeached nor rebutted this testimony. Moreover, as in *Flores–Montano,* "[Camacho] cites not a single accident involving the vehicle or motorist" as a consequence of a Buster search. *Flores–Montano,* —— U.S. at ——, 124 S.Ct. at 1587. Camacho also failed to introduce any evidence that Busters are likely to fail or malfunction in potentially harmful ways. We thus cannot say that the intrusive, involuntary radiation exposure that occurred in *Ek* likewise occurred here, or could have if the Buster malfunctioned.[2] Accordingly, the district court did not err in determining that Busters present "no significant or detectable risk of harm to a motorist."

Because the use of the Buster in this case involved no greater personal intrusion on Camacho than is caused by typical vehicle searches, including the gas tank search upheld in *Flores–Montano,* we hold that the search was a valid border search that

did not require reasonable suspicion. We affirm Camacho's conviction and sentence.

**AFFIRMED.**

---

1. *Ek* held that involuntary x-ray searches "should be restricted to situations where there is a clear indication that the suspect is concealing contraband within his body." 676 F.2d at 382. The Supreme Court in *Montoya de Hernandez* criticized the "clear indication" standard, however, using instead the now familiar "reasonable suspicion" standard. 473 U.S. at 540–41, 105 S.Ct. 3304.

2. In *Ek* "the record was silent on the danger or harmful effects associated with x-ray

searches." *Molina–Tarazon,* 279 F.3d at 715. As noted, however, *Flores–Montano* looked to the defendant to provide some evidence that gas tank searches can be dangerous. 124 S.Ct. at 1586–87. Because the record in this case is devoid of any evidence that Busters expose motorists to detectable levels of radiation, we do not articulate whether or to what extent a defendant must provide evidence of dangerousness in order to bring a successful challenge to a suspicionless border search involving involuntary radiation exposure.