**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

  v.

JULIO CORTEZ-ROCHA,
  *Defendant-Appellant.*

No. 03-50491

D.C. No.
CR-03-00576-TJW

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Southern District of California
Thomas J. Whelan, District Judge, Presiding

Argued and Submitted
June 8, 2004—Pasadena, California

Filed September 21, 2004
Amended January 20, 2005

Before: Stephen S. Trott, Pamela Ann Rymer, and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Trott;
Dissent by Judge Thomas

**COUNSEL**

Ellis M. Johnston III, Federal Defenders of San Diego, Inc., San Diego, California, for the defendant-appellant.

Carol C. Lam, United States Attorney, Patrick K. O'Toole, Joseph S. Smith, Jr., Assistant United States Attorneys (on brief), Patrick K. O'Toole, Assistant United States Attorney (at oral agrument), United States Attorney's Office, San Diego, California, for the plaintiff-appellee.

**ORDER**

The Opinion filed September 21, 2004, and published at 383 F.3d 1093 (9th Cir. 2004) is amended as follows: on page 1097, insert the following text at the end of Section III. A.:

We find strong support for our analysis and our conclusions in *Carroll v. United States*, 267 U.S. 132 (1924) and *United States v. Ross*, 456 U.S. 798 (1982). In *Carroll*, the Supreme Court had before it a disputed warrantless search conducted by prohibition agents who were looking for contraband whiskey suspected to be in an automobile. The whiskey was finally discovered when the agents tore open the car's upholstery in the area of the car's rumble seat. The issue was whether the search violated the Fourth Amendment.

The Court began its constitutional analysis of the tearing open of the upholstery by establishing for automobiles an exception to the Fourth Amendment's warrant requirement:

> We have made a somewhat extended reference to these statutes to show that the guaranty of freedom from unreasonable searches and seizures by the 4th Amendment has been construed, practically since the beginning of the government, as recognizing a necessary difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon, or automobile for contraband goods, where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.

> Having thus established that contraband goods concealed and illegally transported in an automobile or other vehicle may be searched for without a warrant, we come now to consider under what circumstances such search may be made.

*Id.* at 153-54.

Moving to the disputed search itself, the Court held that the warrantless tearing open of the vehicle's upholstery was not

unreasonable. The court based its holding on the proposition that once it had been established that the car could be searched, the agents were entitled to search anywhere a warrant could have authorized the agents to look. "Since such a warrant could have authorized the agents to open the rear portion of the roadster and to rip the upholstery in their search for concealed whiskey, the search was constitutionally permissible." *Ross*, 456 U.S. at 818.

Granted, the agents in *Carroll* had probable cause to search the vehicle for whiskey, but *Carroll* acknowledged the *greater* authority of the government, and the lesser privacy right for individuals, with respect to "[t]ravelers . . . crossing an international boundary because of national self protection . . . ," *Id.* at 408, (quoting *Carroll*, 267 U.S. at 153-54), a theme reaffirmed in *Flores-Montano*.

*Ross* held also that:

> [W]hen a legitimate search is underway, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers in the case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of an automobile, must give way to the interest in the prompt and efficient completion of the task at hand.

> [Footnote 28] The practical considerations that justify a warrantless search of an automobile and its contents have been completed. Arguably, the entire vehicle itself (including its upholstery could be searched without a warrant . . . .

*Id.* at 821, 821 n.28.

We deduce from this authority with respect to searches of automobiles that the answers to two questions become dispo-

sitive of the constitutionality of this kind of search. First, were the law enforcement officers involved justified in a search of the car; and second, was the "*scope of the search* . . . no greater than a magistrate could have authorized . . . ." *Ross*, 456 U.S. at 818.

Here, the answers are unequivocal. To the first question, yes, based on *Flores-Montano* and *Carroll*. The vehicle and its occupants were attempting to cross our border. The border search justification simply takes the place of the need in an ordinary case to show probable cause.

To the second, yes. A magistrate would be authorized under *Carroll* and *Ross* to include within the "scope" of the search warrant the cutting open of a spare tire in search of contraband.

---

With this amendment, Cortez-Rocha's Petition for Rehearing and Petition for Rehearing En Banc remain undecided and pending. In this respect, both parties may file with the Clerk of this Court simultaneous supplemental letter briefs not to exceed two (2) pages in length addressing the opinion as amended. The letter briefs shall be filed within fourteen (14) days of the date of this order. Should a party decide to forego supplemental briefing, the party shall promptly so notify the Clerk of the Court.

So ORDERED.

---

## OPINION

TROTT, Circuit Judge:

Julio Cortez-Rocha appeals from his conviction following a conditional guilty plea for importation of marijuana in viola-

tion of 21 U.S.C. §§ 952 and 960. He asserts that the district court should have suppressed the marijuana discovered during a border search of his vehicle because the invasive search of his vehicle's spare tire was obtained pursuant to an invalid border search. We hold that the border search of Cortez-Rocha's tire did not require reasonable suspicion, and we affirm.

## I.  Background

Cortez entered the United States at the Calexico, California Port of Entry on February 16, 2003 as the driver and sole occupant of a 1979 Chevrolet pickup truck. During a preprimary inspection, a narcotics detector dog alerted to the rear area of Cortez's truck. The vehicle was then referred to the secondary inspection area, where a customs inspector placed a handheld density meter against the side of the vehicle's spare tire. The meter registered a high reading indicating the possible presence of contraband. Customs inspectors then removed the spare tire from underneath the vehicle and proceeded to cut open and inspect the inside of the tire. Therein, the inspectors discovered ten brick-shaped packages, which contained 42.22 kilograms of marijuana. Cortez was arrested as a result of this discovery.

On February 26, 2003, a two-count indictment was filed in the Southern District of California, charging Cortez with importation of marijuana and possession of marijuana with intent to distribute, in violation of 21 U.S.C. §§ 841, 952, and 960. On March 24, 2003, Cortez filed a motion to suppress the marijuana evidence, asserting that it was obtained in violation of the Fourth Amendment. Specifically, Cortez asserted that the cutting open of his spare tire was a non-routine search that must be justified by particularized suspicion. The district court denied Cortez's motion, concluding that the cutting open of the spare tire was a routine border search that did not require reasonable suspicion. Thereafter, Cortez entered a conditional plea of guilty to the importation charge, preserv-

ing his right to appeal the denial of the suppression motion. On September 22, 2003, Cortez was sentenced to time-served plus a two-year period of supervised release.

## II.  Jurisdiction and Standard of Review

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review de novo the district court's denial of a motion to suppress and the district court's determination of whether the government has conducted a legal border search. *United States v. Camacho*, 368 F.3d 1182, 1183 (9th Cir. 2004).

## III.  Discussion

In this case, we must determine whether the border search of Cortez's vehicle, which included a border investigator cutting open Cortez's spare tire, required reasonable suspicion.[1] Cortez contends that cutting open a spare tire without reasonable suspicion must be deemed constitutionally unreasonable because of " 'the particularly offensive manner it is carried out.' " *United States v. Flores-Montano,* 1245 S.Ct. 1582, *1586. n.2 (2004) (quoting *United States v. Ramsey*, 431 U.S. 606, 618, n.13 (1977).

### A.

[1] "Border searches, . . . from before the adoption of the Fourth Amendment, have been considered to be 'reasonable'

---

[1]The existence of reasonable suspicion was not placed at issue in the proceedings below. Rather than disclosing law enforcement materials regarding the drug detector dog and the density buster, which, under *United States v. Cedano-Arellano*, 332 F.3d 568, 573-74 (9th Cir. 2003), is mandatory when the government relies upon a reasonable suspicion argument, the government instead argued that reasonable suspicion was not needed for the border search at issue. Because we agree with the government, as did the district court, that reasonable suspicion was not required to perform the search in this case, we do not address the question of whether reasonable suspicion did in fact exist.

by the single fact that the person or item in question had entered into our country from outside." *United States v. Ramsey*, 431 U.S. at 619. In order to protect the country from the entry of drugs, weapons, explosives, and unauthorized persons and things, the government must be empowered to conduct searches of containers crossing an international border. *See id.* at 618-19. "The border-search exception is grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country." *Id.* at 620.

**[2]** Recently, the Supreme Court addressed the scope of the government's authority to perform vehicular border searches without reasonable suspicion, holding that it "includes the authority to remove, disassemble, and reassemble a vehicle's fuel tank." *Flores-Montano*, 124 S.Ct. at *1587. The Court indicated that "[e]specially destructive searches of property, however, *may* require reasonable suspicion." *United States v. Bennett*, 363 F.3d 947, 951 (9th Cir. 2004) (citing *Flores-Montano*, 124 S.Ct. at *1587) (emphasis added). The Court did not, however, elucidate which searches, if any, are "so destructive" as to require reasonable suspicion. *See Flores-Montano*, 124 S.Ct. at *1587.

Cortez argues that this case is similar to out-of-circuit cases, which hold that the explorative drilling into the body of a vehicle at the border requires reasonable suspicion. *See United States v. Rivas*, 157 F.3d 364 (5th Cir. 1998); *United States v. Robles*, 45 F.3d 1 (1st Cir. 1995); *United States v. Carreon*, 872 F.2d 1436 (10th Cir. 1989). "*Flores-Montano* explicitly left open the question of whether explorative drilling searches of vehicles must be supported by reasonable suspicion." *Bennett*, 363 F.3d at 951 n.3 (citing *Flores-Montano*, 124 S.Ct. at 1587 n.2 ("We have no reason at this time to pass on the reasonableness of drilling, but simply note . . . that this case involves the procedure of removal, disassembly, and reassembly of a fuel tank, rather than potentially destructive drilling.")).

We are not persuaded that the reasoning contained in the explorative-drilling cases mandates a reasonable suspicion requirement in this case. First, the application of the routine/ non-routine balancing test in these cases was specifically refuted in *Flores-Montano*. *Flores-Montano*, 124 S.Ct. at *1585 (expressing disapproval at use of "routine" as the basis of balancing test in the border search context); *see also Rivas*, 157 F.3d at 367 (concluding that "drilling into the body of the vehicle at a border checkpoint" is a "nonroutine search"); *Robles*, 45 F.3d at 5 ("We have little difficulty concluding that drilling a hole into the cylinder was not a routine search."); *see also Carreon*, 872 F.2d at 1442 (not addressing the question of whether the search was routine because reasonable suspicion justified use of electric drill search by border inspectors).

[3] Moreover, although *Flores-Montano* indicates that the government's inherent authority to conduct border searches may be limited to searches that are not unreasonably destructive, the search of a vehicle's spare tire, which neither damages the vehicle nor decreases the safety or operation of the vehicle, is not so destructive as to be unreasonable. *See United States v. Vargas-Castillo*, 329 F.3d 715, 722 (9th Cir. 2003) (search of spare tire did not "reach 'the degree of intrusiveness present in a strip search or body cavity search' " (quoting *United States v. Ramos-Saenz*, 36 F.3d 59, 61 (9th Cir. 1994)).

[4] Although cutting a spare tire is certainly damaging to that tire, the important factor is whether the procedure results in significant damage to, or destruction of, the vehicle. *See Flores-Montano*, 124 S.Ct. at *1587 (gas tank search was not a significant deprivation of property because the procedure "can be reversed without damaging the safety or operation *of the vehicle*") (emphasis added). In this case, there was no significant damage to Cortez's vehicle. There is no doubt that the search and disabling of a vehicle's spare tire does not in any way hinder the operation of the vehicle or impede the travel-

er's immediate ability to continue his travels using the vehicle. *See Flores-Montano*, 124 S.Ct. at *1586-87 (explaining that border searches involving reassembled gas tanks do not hinder vehicles' ability to continue entry into the United States). Nor does the disabling of a spare tire undermine the immediate safety of the vehicle or threaten the security of the vehicle's driver or passengers. Indeed, because cutting the spare tire cannot affect or undermine the vehicle's operation or safety, the procedure is even less damaging to the vehicle than is the removal and reassembly of a vehicle's gas tank, a procedure that, while potentially affecting the vehicle's operation, nonetheless does not require reasonable suspicion. *See id.* at *1587. Finally, any motorist whose vehicle has in fact been damaged during such a search is free to pursue recovery in the form of civil damages. *See id.* (citing 31 U.S.C. § 3723; 19 U.S.C. § 1630).

In this context, a vehicle's spare tire, which is not an operational component of the vehicle, is analogous to a closed suitcase or other container often found inside of a vehicle. The government's longstanding authority to search containers and concealed areas of vehicles crossing the border reflects the practical reality that "[c]ontraband goods rarely are strewn across the trunk or floor of a car; since by their very nature such goods must be withheld from public view, they rarely can be placed in an automobile unless they are enclosed within some form of container." *United States v. Ross*, 456 U.S. 798, 820 (1982); *see also Henderson v. United States*, 390 F.2d 805, 808 (9th Cir. 1967) ("[E]very person crossing our border may be required to disclose the contents of his baggage, and of his vehicle, if he has one."). In order for an inspector to search the inside of the tire, cutting the tire may be necessary. Were we to require reasonable suspicion to conduct similar searches of common vehicular compartments, we would seriously impair the ability of the government to deter, detect, and prevent the unlawful smuggling across the country's borders. Any locked container would be protected by the rule Cortez seeks. A reasonable suspicion requirement in this

context would remove the significant deterrent effect of suspicionless searches and encourage the use of spare tires and other locked containers as a means of smuggling.

We find strong support for our analysis and our conclusions in *Carroll v. United States*, 267 U.S. 132 (1924) and *United States v. Ross*, 456 U.S. 798 (1982). In *Carroll*, the Supreme Court had before it a disputed warrantless search conducted by prohibition agents who were looking for contraband whiskey suspected to be in an automobile. The whiskey was finally discovered when the agents tore open the car's upholstery in the area of the car's rumble seat. The issue was whether the search violated the Fourth Amendment.

The Court began its constitutional analysis of the tearing open of the upholstery by establishing for automobiles an exception to the Fourth Amendment's warrant requirement:

> We have made a somewhat extended reference to these statutes to show that the guaranty of freedom from unreasonable searches and seizures by the 4th Amendment has been construed, practically since the beginning of the government, as recognizing a necessary difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon, or automobile for contraband goods, where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.

> Having thus established that contraband goods concealed and illegally transported in an automobile or other vehicle may be searched for without a warrant, we come now to consider under what circumstances such search may be made.

*Id.* at 153-54.

Moving to the disputed search itself, the Court held that the warrantless tearing open of the vehicle's upholstery was not unreasonable. The court based its holding on the proposition that once it had been established that the car could be searched, the agents were entitled to search anywhere a warrant could have authorized the agents to look. "Since such a warrant could have authorized the agents to open the rear portion of the roadster and to rip the upholstery in their search for concealed whiskey, the search was constitutionally permissible." *Ross*, 456 U.S. at 818.

Granted, the agents in *Carroll* had probable cause to search the vehicle for whiskey, but *Carroll* acknowledged the *greater* authority of the government, and the lesser privacy right for individuals, with respect to "[t]ravelers . . . crossing an international boundary because of national self protection . . . ," *Id.* at 408, (quoting *Carroll*, 267 U.S. at 153-54), a theme reaffirmed in *Flores-Montano*.

*Ross* held also that:

> [W]hen a legitimate search is underway, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers in the case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of an automobile, must give way to the interest in the prompt and efficient completion of the task at hand.

> [Footnote 28] The practical considerations that justify a warrantless search of an automobile and its contents have been completed. Arguably, the entire vehicle itself (including its upholstery could be searched without a warrant . . . .

*Id.* at 821, 821 n.28.

We deduce from this authority with respect to searches of automobiles that the answers to two questions become dispositive of the constitutionality of this kind of search. First, were the law enforcement officers involved justified in a search of the car; and second, was the "*scope of the search* . . . no greater than a magistrate could have authorized . . . ." *Ross*, 456 U.S. at 818.

Here, the answers are unequivocal. To the first question, yes, based on *Flores-Montano* and *Carroll*. The vehicle and its occupants were attempting to cross our border. The border search justification simply takes the place of the need in an ordinary case to show probable cause.

To the second, yes. A magistrate would be authorized under *Carroll* and *Ross* to include within the "scope" of the search warrant the cutting open of a spare tire in search of contraband.

## B.

Seizing upon language from *Flores-Montano*, Cortez — and our colleague in dissent — would have us formulate a new balancing test for determining when a border procedure is so destructive or so damaging as to invade the rights protected by the Fourth Amendment. We decline to do so. Indeed, it was this court's application in *United States v. Molina-Tarazon*, 279 F.3d 709, 713 (9th Cir. 2002), of a balancing test to determine which border searches are non-routine that the Supreme Court specifically refuted in *Flores-Montano*. *See Flores-Montano*, 124 S.Ct. at *1585 (explaining that this circuit had misapplied *United States v. Montoya de Hernandez*, 473 U.S. 531 (1985), and had improperly seized upon "routine," as a descriptive term in discussing border searches to fashion a new balancing test and to extend it to searches of vehicles). Instead, we heed the Supreme

Court's reiterated admonition that "the reasons that might support a requirement of some level of suspicion in the case of highly intrusive searches of the person—dignity and privacy interests of the person being searched—simply do not carry over to vehicles. Complex balancing tests to determine what is a 'routine' search of a vehicle, as opposed to a more 'intrusive' search of a person, have no place in border searches of vehicles." *Id.* at *1585.

Judge Thomas raises the specter of officious border inspectors wielding knives in one hand and this opinion in the other as they wantonly and routinely slash open every spare tire in "every vehicle that crosses the border." He asserts that we have given them "carte blanche" to do so. We respectfully reject this characterization of the practical consequences of our opinion.

First, this scenario discredits — unintentionally and without an intent to criticize, we are sure — the men and women who protect our borders, as well as the agencies for which they work. As do most government employees, all sworn to uphold the Constitution, they exercise informed judgment as they work at their difficult tasks, and they do not waste time on dead-end adventures. It is a mistake simply to see them as cyborgs from the "ready, fire, aim" school of job performance. We believe that these employees and their supervisors and their agencies can be counted on to be intelligent and respectful — as the facts and circumstances of this case demonstrate — as they carry out tasks assigned to them by Congress. On this point, we take our lead from Justice Breyer, who said in his concurring opinion in *Flores-Montano*, "Customs keeps track of the border searches its agents conduct, including the reasons for the searches. This administrative process should help minimize concerns that gas tank searches might be undertaken in an abusive manner." *Flores-Montano*, 124 S.Ct. at 1587. (Breyer, J., concurring).

It is also a mistake to assume sub silentio that we — the judiciary — manage the day to day affairs and control the pol-

icies of the Executive Branch of government. *We* do not *give* carte blanche to anyone. Our job is simply, but importantly, to throw the flag in court when we see relevant constitutional fouls. Here, the Supreme Court has made it clear that the border is different, and that the usual constitutional restrictions on searches and seizures — including the reach of the exclusionary rule — are different as well.

## C.

Cortez asserts also that the procedure performed here was unreasonable because the government had less restrictive means available at the border to conduct searches of vehicles and their tires for contraband. Specifically, Cortez argues that because the government had available narcotic detection dogs, density measuring devices, and x-ray devices capable of scanning his vehicle, such procedures must be utilized by border control inspectors prior to the procedure conducted in this case. We do not agree. As recently stressed in *Flores-Montano*, " 'searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border.' " *Id.* (quoting *United States v. Ramsey*, 431 U.S. at 616). We believe that the government's inherent authority to monitor and secure the country's international borders would be seriously undermined by a court-fashioned least restrictive means test for border control vehicular searches, and we refuse to tie the hands of border control inspectors in such a fashion.

## D.

"It is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *Ramsey*, 431 U.S. at 616; *see also Montoya de Hernandez*, 473 U.S. at 544 ("At the border, customs officials have more than merely an investigative law

enforcement role. They are also charged, along with immigration officials, with protecting this Nation from entrants who may bring anything harmful into this country, whether that be communicable diseases, narcotics, or explosives."). As the Court reiterated in *Flores-Montano*, "The government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *Id.* at 1585. Nowhere is this compelling interest better explained and documented than in the 9/11 Commission 2004 Report of the National Commission on Terrorist Attacks upon the United States. As for the importance of our policing borders in this context, which at this juncture in our history is surely a pressing national "special need,"[2] we draw from that report:

### Terrorist Travel

More than 500 million people annually cross U.S. borders at legal entry points, about 330 million of them noncitizens. Another 500,000 or more enter illegally without inspection across America's thousands of miles of land borders or remain in the country past the expiration of their permitted stay. The challenge for national security in an age of terrorism is to prevent the very few people who may pose overwhelming risks from entering or remaining in the United States undetected.

In the decade before September 11, 2001, border security—encompassing travel, entry, and immigration—was not seen as a national security matter. Public figures voiced concern about the "war on drugs," the right level and kind of immigration, problems along the southwest border, migration crises originating in the Caribbean and elsewhere, or

---

[2]*See Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 677 (1989); *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 633-34 (1989).

the growing criminal traffic in humans. The immigration system as a whole was widely viewed as increasingly dysfunctional and badly in need of reform. In national security circles, however, only smuggling of weapons of mass destruction carried weight, not the entry of terrorists who might use such weapons or the presence of associated foreign-born terrorists.

For terrorists, travel documents are as important as weapons. Terrorists must travel clandestinely to meet, train, plan, case targets, and gain access to attack. To them, international travel presents great danger, because they must surface to pass through regulated channels, present themselves to border security officials, or attempt to circumvent inspection points.

In their travels, terrorists use evasive methods, such as altered and counterfeit passports and visas, specific travel methods and routes, liaisons with corrupt government officials, human smuggling networks, supportive travel agencies, and immigration and identity fraud. These can sometimes be detected.

Before 9/11, no agency of the U.S. government systematically analyzed terrorists' travel strategies. Had they done so, they could have discovered the ways in which the terrorist predecessors to al Qaeda had been systematically but detectably exploiting weaknesses in our border security since the early 1990s.

*Id.*, at 383-384.

**Ressam's Arrest**

Ahmed Ressam, 23, had illegally immigrated to Canada in 1994. Using a falsified passport and a

bogus story about persecution in Algeria, Ressam entered Montreal and claimed political asylum. For the next few years he supported himself with petty crime. Recruited by an alumnus of Abu Zubaydah's Khaldan camp, Ressam trained in Afghanistan in 1998, learning, among other things, how to place cyanide near the air intake of a building to achieve maximum lethality of minimum personal risk. Having joined other Algerians in planning a possible attack on the U.S. airport or consulate, Ressam left Afghanistan in early 1999 carrying precursor chemicals for explosives disguised in toiletry bottles, a notebook containing bomb assembly instructions, and $12,000. Back in Canada, he went about procuring weapons, chemicals, and false papers.

In early summer 1999, having learned that not all of his colleagues could get the travel documents to enter Canada, Ressam decided to carry out the plan alone. By the end of the summer he had chosen three Los Angeles-area airports as potential targets, ultimately fixing on Los Angeles International (LAX) as the largest and easiest to operate in surreptitiously. He bought or stole chemicals and equipment for his bomb, obtaining advice from three Algerian friends, all of whom were wanted by authorities in France for their roles in past terrorist attacks there. Ressam also acquired new confederates. He promised to help a New York-based partner, Abdelghani Meskini, get training in Afghanistan if Meskini would help him maneuver in the United States.

In December 1999, Ressam began his final preparations. He called an Afghanistan-based facilitator to inquire into whether Bin Ladin wanted to take credit for the attack, but he did not get a reply. He spend a week in Vancouver preparing the explosive components with a close friend. The chemicals were so

caustic that the men kept their windows open, despite the freezing temperatures outside, and sucked on cough drops to soothe their irritated throats. While in Vancouver, Ressam also rented a Chrysler sedan for his travel into the United States, and *packed the explosives in the trunk's spare tire well*.

On December 14, 1999, Ressam drove his rental car onto the ferry from Victoria, Canada, to Port Angeles, Washington. Ressam planned to drive to Seattle and meet Meskini, with whom he would travel to Los Angeles and case LAX. They planned to detonate the bomb on or around January 1, 2000. At the Immigration and Naturalization Service (INS) preinspection station in Victoria, Ressam presented officials with his genuine but fraudulently obtained Canadian passport, from which he had torn the Afghanistan entry and exit stamps. The INS agent on duty ran the passport through a variety of databases but, since it was not in Ressam's name, he did not pick up the pending Canadian arrest warrants. After a cursory examination of Ressam's car, the INS agents allowed Ressam to board the ferry.

Late in the afternoon of December 14, Ressam arrived in Port Angeles. He waited for all the other cars to depart the ferry, assuming (incorrectly) that the last car off would draw less scrutiny. Customs officers assigned to the port, noticing Ressam's nervousness, referred him to secondary inspection. When asked for additional identification, Ressam handed the Customs agent a Price Costco membership card in the same false name as his passport. As the agent began an initial pat-down, Ressam panicked and tied to run away.

Inspectors examining Ressam's rental car found the explosives concealed in the spare tire well, but at

first they assumed the white powder and viscous liquid were drug-related—until an inspector pried apart and identified one of the four timing devices concealed within black boxes. Ressam was placed under arrest. Investigators guessed his target was Seattle. They did not learn about the Los Angeles airport planning until they reexamined evidence seized in Montreal in 2000; they obtained further details when Ressam began cooperating in May 2001.

*Id.*, at 176-179.

## IV.  Conclusion

Our purpose is not to give carte blanche to Homeland Security agents to behave recklessly, but to assess their behavior in this case against the Supreme Court's recent guidance. In so doing, we simply disagree that cutting open a spare tire is what the Court had in mind when it cautioned against border searches that are " 'unreasonable' because of the particularly offensive manner [in which they are] carried out." *Flores-Montano*, 124 S.Ct. at 1587 (quoting *United States v. Ramsey*, 431 U.S. 606, 618, n.13 (1977). Moreover, by giving special protection to the contents of a spare tire, the test proposed by our colleague might simply result in making spare tires the smuggler's — and future Ahmed Ressams — container of choice.

**[5]** Any court-imposed obligation requiring border agents to use other means of searching prior to conducting the search at issue in this case would functionally create a particularized suspicion standard, which we have already concluded is not applicable in these circumstances. Because the search of the spare tire, although damaging to that tire, does not constitute the form of vehicle destruction that would warrant an application of the reasonable suspicion standard, we deduce that border control agents were not required to utilize other

procedures prior to cutting and searching the inside of the spare tire.

**[6]** In sum, we conclude that the search of Cortez's spare tire was not a "particularly offensive" border search requiring reasonable suspicion. *See Ramsey*, 431 U.S. at 618 n. 13. We conclude here, as did the Supreme Court in *Flores-Montano* that "[w]hile it may be true that some searches of property are so destructive as to require a different result, this was not one of them." *Flores-Montano*, 124 S.Ct. at *1587. Accordingly, we leave for another day the question of " 'whether, and under what circumstances, a border search might be deemed unreasonable because of the particularly offensive manner it is carried out.' " *Flores-Montano*, S.Ct. at *1587 (quoting *Ramsey*, 431 U.S. at 618, n. 13). Because the Government's authority to conduct suspicionless inspections at the border includes the search conducted in this case, the district court did not err in denying Cortez's motion to suppress. We affirm Cortez's conviction and sentence.

**AFFIRMED.**

---

THOMAS, Circuit Judge, dissenting:

I respectfully dissent.

In *United States v. Flores-Montano*, the Supreme Court recently left open the question of whether and when destructive searches of property at the border might violate the Fourth Amendment. 124 S.Ct. 1582, 1586-87 (2004); *United States v. Camacho*, 368 F.3d 1182, 1185 (9th Cir. 2004); *United States v. Bennett*, 363 F.3d 947, 951 (9th Cir. 2004). In doing so, the Court took great pains to distinguish the circumstances presented by *Flores-Montano* with those involv-

ing a destructive search, and to emphasize that the search in that case was non-destructive.[1] 124 S. Ct. at 1586.

The majority answers this open question by holding that the government may destroy all personal property that does not affect vehicular operation at the border without any suspicion of criminal activity. I do not read *Flores-Montano* that broadly. The clearer implication from *Flores-Montano* is that there *are* Fourth Amendment limits to the ability of the government to destroy property at the border. This is consistent with the Supreme Court's view in other contexts that " '[e]xcessive or unnecessary destruction of property' " can render police conduct unreasonable under the Fourth Amendment." *United States v. Tueller*, 349 F.3d 1239, 1245 (2003) (quoting *United States v. Ramirez*, 523 U.S. 65, 71 (1998)). It is also consistent with the Supreme Court's oft-repeated statement that the "touchstone of the Fourth Amendment is reasonableness," which "is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).

Thus, rather than adopt a bright line rule and give the government *carte blanche* to search and destroy all personal property at the border that does not affect vehicular operation, I would employ the usual, common sense, totality of the circumstances balancing test to determine when a search is so destructive as to require reasonable suspicion. In the present context, the major factors included in this analysis would be the degree of destruction, the ease with which the damage can be repaired, and the convenience, cost, and efficiency of non-destructive or less-destructive searching methods that were available at the search site.

---

[1] The Court noted that the defendant "does not, and cannot, truly contend that the procedure of removal, disassembly, and reassembly of the fuel tank in this case or any other has resulted in serious damage to, or destruction of, the property." 124 S. Ct. at 1586.

In this case, such factors clearly demonstrate that reasonable suspicion was required to cut open Cortez-Rocha's spare tire. Reasonable, non-destructive search methods were readily accessible. The government admits that both a drug dog and a density buster were available at the site. There was nothing preventing the inspectors from assessing the relative tire weight as typical or unusually heavy; indeed, in this case, the tire was removed from the car. In fact, the government used all three of these techniques before cutting open the tire, any of which could create the requisite reasonable suspicion. In addition, the government could have removed the tire from the rim without destroying it.

However, rather than rely upon reasonable suspicion in this case, the government instead seeks a broad rule permitting it to indiscriminately destroy the property of any person crossing the border. I would not hold, as the majority does, that in these circumstances the government may ruin the spare tire of every car that crosses the border, regardless of the resulting safety risks or cost to the motorist.[2]

Although the majority opinion cites *Flores-Montano*'s admonition against balancing tests, that admonition is against employing a routine/non-routine balancing test to border searches in general. *Flores-Montano*, 124 S.Ct. at 1585. A totality of the circumstances test to assess whether a search is so destructive as to require reasonable suspicion need not be employed when searches are non-destructive, *see, e.g.*, *Camacho*, 368 F.3d at 1185, a rule that fully respects the fact that

---

[2]By this statement, I do not imply any criticism of the men and women who serve their country under difficult conditions at our nation's borders. Indeed, as I have emphasized, the officers in this case took pains to develop reasonable suspicion, as I believe they should. However, the government has chosen to take the litigating position that there are no Fourth Amendment limits to destructive searches at the border which, carried to its logical conclusion, means that there are no Fourth Amendment restrictions to border searches at all. It is that position with which I respectfully disagree.

most property searches at the border are, by virtue of the fact that they occur at the border, reasonable. *Flores-Montano*, 124 S.Ct. at 1585. However, *Flores-Montano* contains no admonition against using a totality of the circumstances balancing test to assess reasonability when that question is squarely posed, as it is here, given a destructive property search at the border. *Id.* at 1587.

We cannot assess the "reasonability" of a search under the Fourth Amendment in any principled manner without some sort of balancing test, except in those particular circumstances, such as non-destructive property searches, where reasonability may be presumed. We cannot presume reasonability here, where the government seeks a rule that it may perform a search so destructive to a person's property that the property becomes useless.

As the "significant factor" in determining whether a search is so destructive as to require reasonable suspicion under *Flores-Montano*, the majority creates a distinction between destruction of functional vehicle components and destruction of containers in the vehicle. Even if this were a fair interpretation of *Flores-Montano*, a spare tire is not a container but, in fact, is a functional vehicle component placed in the automobile for safety purposes; thus, the point is not well taken in the context of this case. Regardless, the fact that a person's property does not happen to be a vehicle part does not make a destructive search of that property more reasonable. The Fourth Amendment does not value vehicle parts more highly than containers of other articles of personal property. Nor does *Flores-Montano* suggest a distinction between functional vehicle components and other personal property. 124 S.Ct. at 1587 ("[I]t may be true that some searches of *property* are so destructive as to require [reasonable suspicion]") (emphasis added). Unreasonable and irreparable destruction of a suitcase, a rare item, or an item of sentimental value is also violative of a person's right to be secure in his or her person and

property. U.S. Const. amend. IV. Yet any such destruction is permissible under the majority's reasoning.

The majority also virtually discounts the fact that less intrusive alternatives exist to cutting open a spare tire, by stating that a least-intrusive means test would undermine the government's inherent authority to conduct searches at the border without suspicion. But the fact that a *least*-intrusive means test would be inappropriate does not indicate that the presence of inexpensive and less-destructive means of searching is completely irrelevant. I would include the presence of those means at a particular site, as well as their ease of use, in the analysis of whether it is reasonable to engage in a destructive search without suspicion.

The majority also appears to dismiss the harm engendered by destroying a spare tire, in part by citing to the fact that victims of property destruction can obtain civil damage remedies. While this remedy exists, it is irrelevant to the question whether a destructive search is of the sort that violates the Fourth Amendment. Neither *Flores-Montano* nor the majority opinion alter the exclusionary rule as a remedy for Fourth Amendment violations. The Court in *Flores-Montano* stated that in the context of a vehicle tank dismantle search which *generally* poses no harm to the property, the cure for any damage that did occur would be economic:

> Respondent cites not a single accident involving the vehicle or motorist in the many thousands of gas tank disassemblies that have occurred at the border. A gas tank search involves a brief procedure that can be reversed without damaging the safety or operation of the vehicle. If damage to a vehicle were to occur, the motorist might be entitled to recovery.

124 S.Ct. at 1587. In other words, gas tank disassemblies do not, as a general matter, cause damage and are therefore *per se* reasonable at the border. Any damage caused would result

from accident or negligence, not an unreasonable search in violation of the Fourth Amendment, and would therefore be properly cured by a tort.

This statement does not alter the rule that when there is a sufficiently causal relationship between property destruction and the fruits of a search, those fruits are suppressed. *See United States v. Ramirez*, 523 U.S. 65, at 72 n.3 (1998) ("Because we conclude that there was no Fourth Amendment violation, we need not decide whether, for example, there was sufficient causal relationship between the breaking of the window and the discovery of the guns to warrant suppression of the evidence.") (citing *Nix v. Williams*, 467 U.S. 431 (1984) (creating the independent source doctrine as a limitation on the exclusionary rule) and *Wong Sun v. United States*, 371 U.S. 471 (1963) (holding that direct and indirect evidence from unlawful searches is inadmissible)).

Finally, the majority finds justification for eliminating all Fourth Amendment restrictions at the border in our nation's recent tragedies. The times demand vigilance, of course. But our country has been through periods of great national distress before, in which we have also faced great threats at our borders. The challenge in such times is not to allow our fear to overcome our values. The best course is to confront these menaces with vigor, but without abandoning our equal adherence to the rights upon which our nation was founded. By taking a balanced, common sense approach to border searches, we both protect our nation from harm and preserve the rights that we hold dear.

In the present context, the only question is whether the Fourth Amendment places any limits on the government's right at the border to destroy personal property that does not impair vehicular operation. I believe that it does and would apply the traditional totality of the circumstances analysis to assess whether such destructive government searches are reasonable within the meaning of the Fourth Amendment.

Therefore, I respectfully dissent.